IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | Case No. CR-10-121-E-EJL |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM DECISION** |
| vs. | ) | **AND ORDER** |
| | ) | |
| OSCAR LOPEZ HERNANDEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Pending before the Court in this matter is Defendant's Motion to Suppress all evidence obtained as a consequence of a traffic stop and the resulting search of the vehicle and containers therein and/or any statements made by the Defendant following his arrest. The Government opposes the motion. On January 10, 2011, the Court held a hearing on the Motion and took the matter under advisement, directing the parties to submit supplemental briefing on the Motion. The parties have now filed their supplemental briefing and the matter is ripe for the Court's consideration.

**Factual Background**

On April 17, 2010, at approximately 5:00 p.m., Idaho State Police Trooper Brady Barnes observed a black 1990 Honda Accord traveling on Interstate 15 just north of Pocatello, Idaho. The vehicle's window tinting appeared to Trooper Barnes to exceed that allowed by Idaho Code § 49-944 which is a civil traffic infraction. Trooper Barnes executed

a traffic stop on the vehicle which was being driven by the Defendant, Oscar Lopez Hernandez, and occupied by a female passenger, the Defendant's wife, who was pregnant at the time. Upon initial contact, Trooper Barnes testified that he observed the Defendant's eyes were bloodshot and glossy, his speech was excited, and he appeared to be nervous. The officer further testified that the Defendant gave changing and conflicting stories regarding the vehicle's ownership and his path of travel. Corporal Barnes testified he noticed the internal paneling in the vehicle appeared to have been removed and replaced which, based on his training and experience, he knew to be an indication that the vehicle was used for drug trafficking. Ultimately, the Defendant was unable to produce a valid identification or driver's license and admitted that his driver's license was suspended. The Defendant did give the Trooper his social security number. Trooper Barnes returned to his patrol car and confirmed through dispatch that the Defendant had an invalid driver's license.

Trooper Barnes reapproached the car asking the Defendant to exit the vehicle and told him he would be cited for driving on an invalid driver's license. Trooper Barnes engaged in further inquiry of the Defendant including having him perform a field sobriety test. Trooper Barnes then asked if he could search the vehicle. Trooper Barnes testified the Defendant verbally consented to the search. In following department protocol, Trooper Barnes then called for a second officer to respond to the scene.

While waiting for the second officer, Trooper Barnes performed the pat down search of the Defendant and continued talking with the Defendant. Once the second officer arrived, they commenced a search of the vehicle and ultimately found methamphetamine in a tool box

**Memorandum Decision and Order - 2**

located under the passenger seat of the car. The Defendant was placed under arrest and read his *Miranda* rights. The Government has filed a Superseding Indictment charging the Defendant with Conspiracy to Distribute a Controlled Substance, Possession with Intent to Distribute a Controlled Substance, and lists a Criminal Forfeiture Allegation. (Dkt. No. 25.)

**DISCUSSION**

**I.      The Traffic Stop**

The Defendant does not question the legality of the traffic stop itself as it was made with the requisite reasonable suspicion of an actual traffic infraction; i.e. violation of Idaho Code § 49-944. (Dkt. No. 33, p. 7.) Instead, the Defendant asserts the scope and duration of the stop were excessive and in violation of his constitutional rights. The Government counters that the stop was lawful, the scope of the stop was not impermissibly expanded, and the stop was of a reasonable length given the totality of the circumstances.

**A.      Scope of the Traffic Stop**

The constitutionality of an investigative detention is judged under the framework established in *Terry v. Ohio*, requiring that the scope of an investigative detention "must be carefully tailored to its underlying justification ..., and [may] last no longer than is necessary to effectuate the purpose of the stop." 392 U.S. 1, 19 (1968). Questions prolonging the detention must be "reasonably related in scope to the justification of [the] initiation," unless additional suspicious factors supported by reasonable suspicion justify a broadening of that scope. *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007). "Reasonable suspicion"

requires a minimal level of objective justification, more than an inchoate or unparticularized suspicion or "hunch," but less than probable cause. *United States v. Sokolow*, 490 U.S. 1, 7, (1989). In assessing the existence of reasonable suspicion, the court considers the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

The events leading up to Corporal Barnes' questions in this case require the Court to decide whether the suspicious factors noted by the officer -- the Defendant's bloodshot/glassy eyes, excited speech, nervousness, and conflicting story -- were sufficient to justify the officer's further investigation and inquiry into criminal activity other than the traffic infraction. Permissible deductions and rational inferences drawn from an officer's experience, training, and expertise form a part of the officer's "collective knowledge," as long as rooted in "objective facts" and as long as amenable to "rational explanation." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (a "gloss on this rule prohibits reasonable suspicion from being based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.") (citation omitted).

Having viewed the video of the stop, considered the testimony of the witnesses at the hearing, and reviewing the record herein, the Court finds the stop and subsequent inquiry were proper and supported by reasonable suspicion. It is undisputed that Corporal Barnes had a valid basis for the initial stop. *See Whren v. United States*, 517 U.S. 806, 810 (1996) (holding no Fourth Amendment violation occurs when an officer stops a driver if the officer

has probable cause to believe that a traffic violation has occurred.). Corporal Barnes limited his initial inquiry of the Defendant to standard questions regarding driver's licenses and vehicle registration which were properly tailored to the reason for the stop, the traffic infraction, and therefore did not exceed the scope of the stop. *See United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001), *amended by* 279 F.3d 1062 (9th Cir. 2002) ("An officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop."). During this initial contact with the Defendant, Corporal Barnes noticed suspicious factors which were particularized and objective. Corporal Barnes testified that the Defendant had glassy and bloodshot eyes, was more nervous than the average citizen, and his "story" did not make sense.[1] Based on his initial observations of the Defendant as well as the fact that the Defendant was driving with an invalid license, the conflicting description for his route of travel, his explanation for

---

[1] At the hearing, defense counsel asked Corporal Barnes to step down from the witness stand and take a look at the Defendant's eyes on the day of the hearing. Corporal Barnes did so and testified that the Defendant's eyes were "glassy and bloodshot today" and in a "similar" condition as they were on the day of the traffic stop. The fact that the Defendant had glassy and bloodshot eyes on both days, or even every day, can be explained in many ways. The decisive fact here is that Corporal Barnes' objective observation of the condition of the Defendant's eyes at the time of the traffic stop to be glassy and bloodshot and that fact, coupled with the other particularized suspicious factors present, gave Corporal Barnes reasonable suspicion to investigate further into the possibility of drug related crimes. *See United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002) (holding even if an officer makes a mistake of fact, that mistake "will not render a stop illegal, if the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot."). Further, that the Defendant's eyes are apparently glassy and bloodshot most of the time is corroborative of Corporal Barnes' observation of his eyes at the time of the stop. Though the Defendant did attempt to explain the condition during the officer's second inquiry, by that point Corporal Barnes' particularized suspicions were reasonably heightened given the inconsistent story and suspicious paneling in the vehicle to warrant the further investigation.

possessing a vehicle owned by another individual, and his observations regarding the suspicious paneling inside the vehicle, Corporal Barnes was justified in expanding the scope of his questioning.

The defense questions the credibility of Corporal Barnes' testimony at the hearing noting he did not reference the appearance of the Defendant's eyes or nervousness on the video at the time of the stop. (Dkt. No. 33, p. 3.) The Court does not find the fact that Corporal Barnes did not specifically mention these factors on the video at the beginning of the stop to render his testimony untrustworthy. These observations were made during the course of Corporal Barnes initial questioning. It would be counter-productive for Corporal Barnes to reveal to the Defendant all of his suspicions during his inquiry as it might tip off the Defendant or otherwise compromise Corporal Barnes' investigation. Notably, after he asked the Defendant to step out of the car, Corporal Barnes told the Defendant he noticed his "eyes were glassy and real bloodshot" and asked him if that was typical. (Govnt. Ex. 1, Video at 18:33.) Corporal Barnes informed the Defendant that he was concerned about alcohol or marijuana use because of the appearance of his eyes. (Govnt. Ex. 1, Video at 19:15.) The officer then performed the field sobriety test. Corporal Barnes also confronted the Defendant with the fact that his "story" explaining his purpose and route of travel along with why he was driving someone else's car "didn't make any sense." (Govnt. Ex. 1, Video at 19:33.) Based on these facts, the Court finds Corporal Barnes' testimony to be truthful.

The defense is also critical of Corporal Barnes' "internal monologue" recorded while the officer was following the Defendant's vehicle to initiate the stop. These comments were

**Memorandum Decision and Order - 6**

expressed while the officer was inside his vehicle. Though they could be considered in-polite or stereotyping, the comments themselves were not the basis for the stop nor the basis for expanding the scope of the stop. Moreover, Corporal Barnes testified some of his comments were to make a record; i.e. he has a "habit of saying the plate on tape." The Court does not find the "internal monologue" to render Corporal Barnes' testimony to be untruthful because the basis for the stop was valid and the subsequent observations by Corporal Barnes gave rise to a legitimate suspicion. Further, Corporal Barnes made other similar comments on the recording while waiting for the response from dispatch which are consistent with his testimony that he often makes comments to himself during the course of his duties. (Govnt. Ex. 1, Video at 12:40-15:15.) Based on the foregoing, the Court concludes Corporal Barnes' testimony was credible and that he possessed a particularized and objective suspicion that, based on his training and experience and the totality of the circumstances, gave rise to a reasonable suspicion which warranted his further investigation. Therefore, the Court finds the officer did not unlawfully expand the scope of the stop.

### B. Length of the Traffic Stop

Defendant next argues the traffic stop was unreasonably prolonged without any particularized suspicion in violation of his Fourth Amendment rights. The Government maintains that Corporal Barnes' observations during the stop gave rise to the requisite suspicions to expand the original scope of the stop and that the stop was not unreasonably long.

As to the length of the stop, the Supreme Court's has "held repeatedly that mere police

**Memorandum Decision and Order - 7**

questioning does not constitute a seizure" and thus no separate reasonable suspicion is required to justify questioning that does not prolong an initially lawful stop. *United States v. Turvin*, 517 F.3d 1097, 1100 (9th Cir. 2008) (*quoting Muehler*, 544 U.S. at 101 and citing *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007)). Thus, where the officers' questioning does not extend the duration of a lawful stop, "the expanded questioning need not have been supported by separate reasonable suspicion." *Id.* at 1100. Recently, the Supreme Court "made plain," that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 129 S.Ct. 781, 788 (2009) (citation omitted).

Here, the length of the stop extended beyond that of a standard traffic stop in that it lasted approximately an hour.[2] Such an extension is allowable, however, where the officers had a legitimate reasonable suspicion for pursuing further investigation. "The critical inquiry is whether the officers' diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the

---

[2] The Defendant pulled his vehicle over approximately five and a half minutes after the officer began his pursuit. Corporal Barnes' initial inquiry of the Defendant lasted approximately eight minutes, which included questioning regarding the Defendant's route of travel. It took around 5 minutes for the officer to verify the Defendant's information with dispatch. The second inquiry by Corporal Barnes after the Defendant was outside of the vehicle took around three minutes before the Defendant consented to the search.
From the time of the Defendant's consent to search it took just over six minutes for the second officer to arrive and for the search to begin. Four and a half minutes into the search, Corporal Barnes discovered the methamphetamine and effectuated an arrest of the Defendant. Thereafter, the officer completed his search of the vehicle and left the scene approximately an hour after he initiated his pursuit.

**Memorandum Decision and Order - 8**

defendant." *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir. 1996); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.").

Corporal Barnes testified that his suspicions were heightened from the beginning of the stop with his initial observations of the Defendant's eyes, nervousness, conflicting story, and admission that he had an invalid license. His suspicions continued throughout the stop such as when he noted the appearance of the paneling of the vehicle looked as though it had been removed which, he testified based on his training and experience, indicates the vehicle may be used for drug trafficking. Upon making his initial observations that indicated the Defendant may have been impaired and the appearance of the vehicle's paneling, Corporal Barnes initiated questioning regarding the Defendant's travel route and the ownership of the car. When the Defendant's responses "didn't make sense," Corporal Barnes pursued further investigation of his suspicions by asking the Defendant additional questions, performing a field sobriety test, and requesting consent to search the car. Given these circumstances, Corporal Barnes' questioning and investigation at the scene were reasonable. Each of these actions by Corporal Barnes were reasonable in his diligent efforts to dispel his suspicions of illegal activity. *See Torres-Sanchez*, 83 F.3d at 1129. Further, at no time during the stop did either officer threaten force, exaggerate displays of authority, or otherwise use coercive tactics. *Id.* Based on the foregoing, the Court finds the scope and length of the stop were reasonable given the specific and particularized suspicions of Corporal Barnes.

Moreover, the Court finds Corporal Barnes diligently and quickly took measures to

**Memorandum Decision and Order - 9**

confirm or dispel his reasonable suspicions during the stop. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985) (holding that common sense and ordinary human experience govern an evaluation of whether an officer exceeded the time reasonably needed to effectuate the purposes of the investigative stop). During his inquiry, the officer made initial observations of the Defendant's appearance and the interior of the car which reasonably heightened his suspicions. After the Defendant was unable to produce his license or provide a reasonable explanation for his possession of the vehicle owned by another, the officer's suspicions were further heightened such that additional questioning regarding the Defendant's path of travel were warranted. Given the totality of the circumstances here, Corporal Barnes was justified in delving further so as to either confirm or dispel his reasonable suspicions by asking the Defendant to step out of the vehicle, perform a sobriety test, and request consent to search the vehicle. After the Defendant agreed to allow a search of the vehicle, department policy required Corporal Barnes to have a second officer present before he began the search. Corporal Barnes informed the Defendant that it might take a little time for the second officer to arrive to which the Defendant did not object. Based on these circumstances, although the entire stop itself lasted over an hour, the Court finds the stop was not unreasonably delayed given the officer had a legitimate reasonable suspicion for pursuing further investigation and did so in a diligent and timely fashion.

## II.     Consent to Search

Defendant asserts his consent was involuntary given the coercive environment created

by the officers during the stop.[3] The Government argues the consent was voluntary as the Defendant was free to leave at any time and unrestrained when the officer requested the consent to search.

Valid consent to search is a well-established exception to the Fourth Amendment's prohibition of warrantless searches. To "establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent was freely and voluntarily given." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "[F]ree and voluntary consent cannot be found by a showing of mere acquiescence to a claim of lawful authority." *United States v. Shaibu*, 920 F.2d 1423, 1426; *see also United States v. Spires*, 3 F.3d 1234, 1237 (9th Cir. 1993). Rather, the government "must show that there was no duress or coercion, express or implied" and that the consent was "unequivocal and specific" and "freely and intelligently given." *Shaibu*, 920 F.2d at 1426.

Whether consent was freely and voluntarily given is to be determined from the totality of all the circumstances. *United States v. Reid*, 226 F.3d 1020, 1026 (9th Cir. 2000). In making this determination, the Court applies a multi-factor fact-intensive test to determine

---

[3] In his initial briefing, the Defendant argues he did not consent to the search or that the Government cannot prove he consented. (Dkt. No. 23, p. 2.) (The defense's initial briefing argues the Defendant's response is "unintelligible" on the video of the stop). In his post-hearing memorandum the Defendant argues only that his consent was involuntary. (Dkt. No. 33.) The Court, having viewed the video evidence of the stop and the testimony at the hearing, finds the Defendant consented to the search of the vehicle. The Defendant's manner in consenting saying "feel free" was without hesitation. (Govnt. Ex. 1, Video at 20:10.) Thus, only the question of whether the consent was voluntary will be discussed in this Order.

**Memorandum Decision and Order - 11**

whether a person has given free and voluntary consent to conduct a search and do not place dispositive weight on any single criterion. *United States v. Perez-Lopez*, 348 F.3d 839, 846 (9th Cir. 2003); *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000). In doing so, the following factors assess whether the consent was voluntary: (1) whether the person was in custody; (2) whether the officers had their guns drawn; (3) whether a *Miranda* warning had been given; (4) whether the person was told that he had the right not to consent; and (5) whether the person was told that a search warrant could be obtained. *See United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (citing cases). Although no one factor is determinative in the equation, "many of this court's decisions upholding consent as voluntary are supported by at least several of the factors." *Id.* (citing *Chan-Jimenez*, 125 F.3d at 1327 n. 3). In addition, because the facts of each case are unique, the court may also consider other relevant factors. *See Liberal v. Estrada, et al.*, ___ F.3d ___, 2011 WL 149348, *14 (9th Cir. Jan. 19, 2011).

Having viewed the video of the stop, considered the testimony of the witnesses at the hearing, and reviewing the record herein, the Court finds the consent to search here was freely and voluntarily given by the Defendant. In considering the relevant factors, the Court first considers whether the Defendant was in custody. The defense argues he was in custody under these circumstances given the officers' actions and the fact that Corporal Barnes maintained possession of the licenses of both the Defendant and his wife.

In *United States v. Chan-Jimenez*, the Ninth Circuit held that a seizure occurs when an officer retains a citizen's driver's license or registration "longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the needed papers." 125 F.3d at 1326. In that case, the officer had examined the defendant's license and registration and found nothing out of order but, nonetheless, retained possession of the documents longer than was necessary to complete his investigation. In addition, the officer in *Chan-Jimenez* displayed a show of force when he kept his hand on his revolver. Under such circumstances, the Ninth Circuit concluded a reasonable person would not have believed he was free to leave.

Here, the fact that Corporal Barnes maintained possession of the licenses does not, in and of itself, equate to the Defendant being in custody given the totality of the circumstances in this case. For one, the Defendant's license was invalid and, therefore, the Defendant could not have lawfully driven away with or without the document. The Defendant's wife's license was apparently lawful which may have made her feel obligated to stay, particularly given her pregnancy. Consequently, the Defendant may have also felt he must stay with his wife. These

**Memorandum Decision and Order - 13**

assumptions, however, are negated in some respect by the conversations between Corporal Barnes and the Defendant regarding how the Defendant would leave the scene at the conclusion of the stop. As such, the Court does not find given the totality of the circumstances here that the Defendant was in custody. Regardless, even if the Court were to conclude that the Defendant was in custody in this case, the Court finds given the other factors used to determine voluntariness, the totality of the circumstances were not so coercive that the Defendant's consent to search the vehicle was involuntary.

The Defendant maintains that the circumstances were coercive because Corporal Barnes maintained "constant surveillance" of the Defendant and his wife, the overhead patrol lights were on during the entire stop, the officers gave constant instructions, and limited both individuals' movements throughout the stop. The Court disagrees. The totality of the circumstances of the stop in this case are not as coercive as argued by the defense. The facts noted by the defense were steps properly taken by the officers for safety reasons. Using the overhead patrol lights during the stop on the side of a road alerts other motorists that their vehicles and individuals are located on the side of the road. The officers' limiting the movements of the individuals, giving instructions, and surveilling of the Defendant are all reasonable precautionary measures to be taken during a traffic stop for the safety of the officers and the public. Such circumstances did not create a coercive environment.

**Memorandum Decision and Order - 14**

As to the second factor, whether the arresting officers drew their weapons, the officers here did not display any force towards the Defendant or his wife. The Defendant argues at one point Corporal Barnes had his hand near or on his gun holster. The video, however, reflects that neither officer ever drew or threatened to use their weapon. The fact that the officers did not display any show of force towards the Defendant or his wife distinguishes this case from the circumstances that were present in *Chan-Jimenez*.

In addition, the officers' conversations with the Defendant did not produce a coercive atmosphere. Just the opposite, the conversations appeared to be cordial and professional. Prior to the consent being given, the Defendant had been told he would be cited for driving without a valid license. After the Defendant gave his verbal consent to search, he and Corporal Barnes continued to talk while waiting for the second officer to arrive before the search began. Corporal Barnes discussed with the Defendant having his wife drive them home since the Defendant had a suspended license. (Govnt. Ex. 1, Video at 22:30.)

Based on the foregoing the Court concludes the Defendant was not in custody and a reasonable person in the same situation would have felt free to leave. Even if the Defendant was in custody, the totality of the circumstances here do not evidence a coercive environment such that the Defendant's consent was involuntary or the Defendant did not feel he could decline the giving of consent to search. Though the officers did not advise the Defendant that he could refuse consent, that was not required. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 232 (1973). Likewise, because the Defendant was not in custody the officers were not required to give him any *Miranda* warnings. *See United States v. Kim*, 25 F.3d 1426, 1432

**Memorandum Decision and Order - 15**

(9th Cir. 1994). The officers also did not threaten the Defendant that a search warrant could be obtained or give some other indication that they would be able to search even without his consent. The Court also finds the Defendant's mannerism in his consent to be telling in that he said "feel free" and was not hesitant to give his consent or limit it in anyway. The officer even went as far as to confirm the Defendant's consent. Based on the totality of the circumstances in this case, the Court finds the Defendant's consent to search was freely and voluntarily given.

## III. Scope of the Search

The Defendant further argues that if the Court finds he consented, the search of the containers inside the vehicle exceeded the scope of the search. The Defendant points out that the officers did not seek additional consent to search the tool box where the drugs were found or to inquire/determine the owner of the tool box. (Dkt. No. 23, p. 11.) The Government counters that the Defendant's general consent to search the automobile authorized the search of any container within the vehicle that could contain contraband.

The Government cites to *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) and *United States v. Gutierrez-Medeiros*, 965 F.2d 800 (9th Cir. 1992) both of which held a general consent to search authorized the officers to search any container within the car that could reasonably contain contraband. (Dkt. No. 29.) The holding of those cases has been distinguished by some other courts based on the facts of the particular containers at issue including whether the containers were locked compartments of the car, locked containers separate from the car itself, and the overall circumstances of the search. In *Jimeno* the Court

**Memorandum Decision and Order - 16**

recognized that the scope of a consensual search is defined by its object. *Jimeno*, 111 S.Ct. At 1804 (search of a folded brown paper bag during a vehicle search). Thus, inquiry turns on the manner in which the officers gained access to the container, i.e. prying open a locked container and whether a reasonable person would believe the defendant's consent authorized the officers actions given the circumstances. *See US v. Reeves*, 798 F.Supp. 1459, 1470 (E.D. Wash. 1992) (The defendants general consent to search the trunk of a vehicle could not have been reasonably interpreted to authorize a search of the locked briefcase located therein.).

The circumstances surrounding the search of the tool box here indicate the officers' search was lawful. The toolbox was not a locked container. Though they did not ask specifically if the Defendant consented to a search of the toolbox, the Defendant give a general consent to search the car without any limitation or later modification or withdraw of the consent. The video evidence shows the Defendant was unequivocal in his consent to search by responding to Corporal Barnes' request by stating "feel free." The officer followed up on this response by asking "are you saying yes I can" to which the Defendant responded "yes." The Defendant did not hesitate to give his consent nor did he limit his consent in anyway.

Further, there is no indication that the officers mislead or coerce the Defendant in an attempt to obtain his consent or make him believe he could not withdraw his consent at any time during the search. Accordingly, the Court finds the scope of the officer's search was proper and within the general consent to search voluntarily given by the Defendant. The Motion to Suppress will be denied.

**Memorandum Decision and Order - 17**

# ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the Defendant's Motion to Suppress (Dkt. No. 23) is **DENIED**.

IT IS FURTHER ORDERED that the trial in this matter is set for **Tuesday, April 5, 2011** at 9:30 a.m. in Pocatello, Idaho.

DATED: **February 4, 2011**

*/s/ Edward J. Lodge*

Honorable Edward J. Lodge
U. S. District Judge